UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RONALD LEE BERGER, *for himself and all others similarly situated*, | ) | Case No.: 1:05 CV 1508 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| THE CLEVELAND CLINIC FOUNDATION, | ) | |
| | ) | |
| Defendant | ) | <u>ORDER</u> |

Plaintiff Ronald Lee Berger ("Plaintiff" or "Berger"), brings the above-captioned class action lawsuit against Defendant The Cleveland Clinic Foundation ("Defendant" or "the CCF" or "the Clinic"), alleging that the CCF forced him to work through his meal periods without compensation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), the Ohio Minimum Fair Wage Standards Act, O.R.C. §§ 4111.01-99, and his at-will employment agreement. (Pl.'s Am. Compl. ¶¶ 30-40, ECF No. 4.) The Complaint also includes collective and class action claims, with Berger seeking to act on behalf of all similarly-situated Class Members. (*Id.* ¶¶ 18-29.)

Currently pending before the court are Defendant's Motion for Summary Judgment (ECF No. 38) and Plaintiff's Motion for Collective and Class Action Certification (ECF No. 20). For the reasons that follow, both motions are granted in part and denied in part.

# I. FACTS AND PROCEDURAL HISTORY

## A. General Background

The CCF, a large world-renown health center, is a not-for-profit corporation with its principal place of business in Ohio. (Pl.'s Am. Compl. ¶ 8.) Plaintiff worked as a respiratory technician in the Department of Pulmonary, Allergy and Critical Care Medicine at the CCF's main campus in Cleveland from February, 1982, until his voluntary retirement on or about March 31, 2005. (Dep. of Ronald Lee Berger ("Berger Dep.") 25-26, ECF No. 40.) Plaintiff was a non-exempt employee who was paid an hourly wage. (Def.'s Answer ¶ 11, ECF No. 7.) Plaintiff worked the evening shift for several years, and then switched over to the day shift in or around 2003. (Berger Dep. at 47.) According to Edward Hoisington ("Hoisington"), Plaintiff's direct supervisor, the department employs 80 to 100 respiratory therapists and respiratory technicians,[1] including students. (Unsworn Decl. of Edward Hoisington ("Hoisington Decl.") ¶ 2, ECF No. 40; Berger Dep. at 42.)

Like all the other therapists in the department, Plaintiff was an at-will employee. (Hoisington Decl. ¶ 2.) Plaintiff's duties were to aid physicians and nurses by assisting in respiratory emergencies, performing respiratory treatments, teaching patients respiratory exercises, and maintaining computerized patient charts. (Berger Dep. at 27-33.) The therapists use pagers to communicate with each other, as well as with their supervisors and other hospital staff. (Dep. of

---

[1]    Plaintiff's Opposition Brief states that the positions of respiratory technicians and respiratory therapists are treated identically and that the positions comprise almost the same duties. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n Br.") 4 n.4, ECF No. 61.) Defendants dispute this fact, and Plaintiff testified in his deposition to the many respiratory therapy procedures that he, as a respiratory technician, is not allowed to perform. (Berger Dep. at 34-36, ECF No. 39.) However, it is undisputed that respiratory therapists and respiratory technicians were subject to the same meal break policies. Therefore, for the sake of convenience only, the court will refer to both respiratory technicians and respiratory therapists as "therapists."

Edward Hoisington ("Hoisington Dep.") 27, 43, ECF No. 40.)  The therapists are required to respond immediately to pages.  (*Id.* at 46.)  Plaintiff testified that he always returned a page within ten to fifteen seconds of receiving it.  (Berger Dep. at 189, ECF No. 22.)  Therapists must keep their pagers with them at all times during their work shift, except in cases of personal or family emergencies, when Hoisington tries to find another therapist to cover the pager.  (Hoisington Dep. at 43-45.)

Hoisington testified as to the types of pages a therapist might receive:

> A person may get a code call for something very brief or very simple.  A patient asking when – you know, he'd like his treatment now or soon, he's just back from x-ray and just wanted to . . . let you know he's back on the floor. . . .
> It could be an issue that could even go into something on the next shift . . . someone is going to be going to an MRI, so they also would give you calls for somebody needs you to suction . . . . They may just want you to get another breathing treatment or even ask you when their last treatment was . . . .
> . . . They may tell you that when you come back you need to do a – we need a blood gas that may either be stat or routine. . . .

(*Id.* at 69, ECF No. 39.)  He also testified that each page requires a therapist to determine whether an immediate need exists or whether a task can wait until after lunch:

> [T]here could be different levels of what [the people paging the therapist] need and sometimes waiting till after lunch is acceptable.  In fact, often the therapist, when they get a call, [asks] do you need me up there right away . . . . That's usually the first question, that the therapist tries to assess the need, how immediate the need is for what they are doing.

(*Id.* at 73-74.)

### B. The CCF's Lunch Break Policies for Therapists

Therapists work an eight and one-half hour shift, and they are paid on an hourly basis, minus an automatic subtraction for a thirty-minute unpaid lunch break.  (CCF Supervisory Policies and

Procedures Policy # 430 "Breaks and Meal Periods" ("CCF Policy # 430"), ECF No. 40, at tab B(6);

Hoisington Dep. at 105-6.)  The CCF "Breaks and Meal Periods" Policy reads, in relevant part:

> **POLICY**
> The Cleveland Clinic Foundation supports the provision of . . . a meal period without pay for employees working at least five hours. Both breaks and meal periods are scheduled by the supervisor at a time which causes the least inconvenience to the department and provides for adequate staffing for service to patients and other departments.[2]
> . . . .
> **MEAL PERIOD**
> The Cleveland Clinic Foundation provides for employees working at least five hours a minimum 30-minute meal period without pay every 8-hour shift.  The length of the meal period may vary by department and should be taken on a schedule approved by the supervisor.
>
> If, due to the operational needs of the department, the meal period cannot be taken or is shorter than scheduled, this must be indicated on the timekeeping document and computed in the daily elapsed time.

(CCF Policy # 430.)  Hoisington testified, and Plaintiffs do not dispute, that this policy was in effect during the relevant time period.  (Hoisington Dep. at 142.)

It is the CFF's policy to allow the therapists to choose when to take their unpaid thirty-minute lunch break, rather than to schedule lunch breaks.  (*Id.* at 24-25, 78-79.)  According to the CCF, the purpose of this flexibility is to provide the best patient care possible (Dep. of Douglas Kirk Orens ("Orens Dep.") 39, ECF No. 63, at Tab A8) and so that the therapists can fit their lunch break in during lulls in their individual workload, which varies daily (Hoisington Dep. at 24-25, 78-80).

---

[2]    The quoted policy language indicates that supervisors have discretion to allow employees to take their lunch breaks at unscheduled times, thereby effectively refuting Plaintiff's contention that the lack of a scheduled lunch break violated the CFF's policies.  (*See* Pl.'s Opp'n Br. at 6.)

Therapists may take their lunch break anywhere on the clinic grounds, which include a cafeteria, several fast food chains, a gift shop, pharmacy, and ATM. (Berger Dep. at 211.) Plaintiff states that supervisors prior to Hoisington told him that therapists were prohibited from leaving the building during their lunch breaks, and that this was the known policy. (*Id.* at 209-10.) During their lunch breaks, therapists are expected to carry their pager and to respond to all pages they receive, including those from the overhead paging system. (Hoisington Dep. at 44-45.) Plaintiff stated that if a therapist could get someone to cover his pager, he would be allowed to leave the building, but "that's an impossibility because everybody else is so overloaded [with work]." (Berger Dep. at 210.)

### C. Logbook for Therapists' "No Lunches"

One of Hoisington's duties as Respiratory Therapy Supervisor is to serve as the designated timekeeper for the department, to ensure that the therapists' work time is properly credited. (Hoisington Dep. at 117.) CCF policy requires the therapist to record the time he worked by swiping his employee badge in an electronic reader at the start and end of his shift. (*Id.* at 20, 93-94, ECF No. 64, at Tab A7.) Therapists do not swipe in and out for lunch breaks. (Orens Dep. at 39.)

Therapists are instructed to mark in a logbook whenever they forget to clock in or out or whenever they do not get to take a lunch break. (Berger Dep. at 62.) The logbook contains a new page for each week, and it is kept in or on a file cabinet in a doorway near the department secretary's cubicle. (*Id.* at 66-67.) Unless a therapist indicates in the logbook that he did not get a lunch break, then the regular meal break will automatically be deducted from his time card. (CCF Supervisory Policies and Procedures Policy # 359 "Time Card Calculations" ¶ 1, ECF No. 64, at tab B1 ("CCF Policy # 359"); Hoisington Dep. at 117.) Plaintiff states that, during his period of employment, the

-5-

format of the logbook sheets changed often; that there was only a designated spot for "no lunch" indications for a brief period of time (at other times, the therapists noted their missed lunches under the "other/comments" column); and that at times therapists created their own logbook sheets when none were provided for them.  (Pl.'s Opp'n Br. at 9-10; *see* Sample Log Sheets, ECF No. 64, at tab B7.)

Plaintiff stated that he was told to log his missed lunch breaks in the logbook (Berger Dep. at 67-68) and that no one ever told him not to log his missed lunch breaks or to not request to be paid for these periods[3] (*id.* at 68-69).

### D. The CCF's Policy for Reporting Interrupted Lunches

The parties dispute whether the CCF instructed therapists to log their lunches that were interrupted or only those lunches that were missed completely.

### 1. Defendant

Hoisington testified that he tells his employees about the automatic meal deduction and informs them that they should indicate in the logbook when they do not get to take a lunch break or when their break is interrupted.  (Hoisington Dep. at 25-26, 51, 82.)  Hoisington testified that there

---

[3]     At his deposition, Plaintiff testified that although he is aware that other therapists have logged their missed lunches in the logbook, he does not know whether they were paid for that time.  (*Id.* at 62, 136-37; *see* Sample Log Sheets 1, ECF No. 40, at tab B(1).)  In conjunction with his Opposition Brief, Plaintiff submits tables and records delineating other CCF employees' lunch breaks and logbook entries and alleging instances in which these employees were not paid for missed lunches that they reported in the logbook.  However, no employee testified to having any information on whether *Plaintiff* missed his lunches.  As Defendant moves for summary judgment on Plaintiff's claims only, the information regarding other therapists' breaks is not relevant to the instant motion.  Furthermore, as stated in Section III.B, the court grants summary judgment for Defendant on Plaintiff's FLSA claim based on missed (as opposed to interrupted) lunches.

is no option to compensate a therapist for a "partial" lunch (*id.* at 136) but that "[t]he way we have done business all along, we have considered an interrupted lunch a no-lunch.  All you need to do is write that down."  (*Id.* at 165-66.)  He testified as to how the employees are trained regarding logging their interrupted lunches:

> Q:    What do you tell them about interruptions during their meal period, answering pages and other things, about getting back to lunch?
>
> A:    Okay.  And again, if it's at that time of day and they don't get their full lunch and they write it in the book, then I really don't worry about it.  If it's interrupted, they write no lunch, and that's it.  They wrote it, we follow it.  We're on the honor system with it and if they write that in the book, they get it.
>
> Q:    Do you train them to write down interruptions or to write down when they don't get a lunch?
>
> A:    Specifically I have never really gotten into a time frame of what I would consider to be a lunch.  But certainly, like I said, I encourage them, if anything at all affects your lunch period, your lunch break, please write it down.  There are people that will come back and finish lunch or, you know, whatever when they get back.  Or, like I said, sometimes it's a very false alarm type of thing and they are back five minutes later and continue on from there.
>
> Q:    If there's a false alarm and they continue on, should they write down in the book that they didn't get a lunch?
>
> A:    That's what they are encouraged to do.  And I'm pretty sure I used the word legally, that, you know, you are required to get a lunch break and it's deducted from your check and please utilize this if it's not happening.
>
> Q:    So the training is, then, if you are interrupted during lunch then you should write in the logbook that you did not receive a lunch?
>
> A:    And it happens.  I see that in there every pay period several times where someone wrote interrupted lunch, 15-minute lunch, and I'll see that written in the comment, and that to us counts as a no-lunch.
>
> Q:    Okay.  So every time someone writes interrupted lunch, then, your policy is just to automatically pay them for the lunch?
>
> A:    That's correct.

> Q:      And that, as a supervisor, you approve all of those for payments?
>
> A:      I'm the timekeeper, so I do.
>
> . . . .
>
> Q:      . . . . When they have a 15-minute lunch, they write 15-minute lunch because they are going to get paid for 15 minutes of lunch, or how do you handle that?
>
> A:      If they write no lunch, they are going to be reimbursed the entire 30 minutes.  It's 30 minutes, in our mind, that you are guaranteed to get it and we're not going to deduct 15.  In fact, the code itself is, the no-lunch code is a 30-minute, it just puts the 30 minutes right back in to them and pays them. It doesn't break it down into any other increment.  The code is swipe 6 and then that means pay them for the 30 minutes that would have been deducted.

(Hoisington Dep. at 83-85.)  Hoisington testified that a timekeeper inputs "code 6" to indicate that a therapist did not receive a lunch break on a particular day (*id.* at 134, 136) and that one of the reasons the department encourages employees to use the logbook rather than swipe "code 6" themselves is that, in the past, employees have had difficulty using the swiping system and have inadvertently stopped their pay.  (*Id.* at 86.)  Consequently, Hoisington said that he swipes the code for employees' "no lunches" himself to ensure that it is done correctly.  (*Id.*)  Hoisington also said that the CCF is in the process of phasing in an automated timekeeping system.  (*Id.* at 166.)

Douglas Kirk Orens, the manager of the respiratory therapy section, also testified that "[i]f a meal is interrupted for any reason, the employee is to let us know and they will be paid."  (Dep. of Douglas Kirk Orens 64 ("Orens Dep."), ECF No. 64, at tab A8.)

### 2. Plaintiff

Plaintiff avers that:

> 3.      I was told that I should record a "no lunch" in the department logbook only when I was unable to take any lunch at all.

4.  I was never trained to report a "no lunch" if I was interrupted for any length of time.  Whether it was five minutes, an hour, or two hours, I was not trained to report interruptions.

5.  It was my understanding that if I started my lunch, was interrupted part of the way through, and was able to return later in the day to finish, that the Clinic considered that to be a 30 minute meal break.

6.  Based on my observations of my co-workers, it was the practice of respiratory therapists and technicians to write in the logbook only when they were unable to take any break at all.

(Berger Decl. ¶¶ 3-6, ECF No. 64, at tab B6.)

### 3. Other CCF Employees

Plaintiff cites testimony from other CCF employees, alleging that they also believed that they were supposed to log only their missed lunches, not their interrupted lunches.  Defendant in turn argues that Plaintiff has misrepresented the employees' testimony and that it actually supports the CCF's position.

Katherina Ickes testified that:

> I don't remember verbatim what was told to me at orientation regarding lunch breaks; however, it's not standard to write interrupted lunches as a no lunch. . . . If the lunch break was started and it was interrupted shortly after, for example, within five minutes, and you're called away for an extended period of time – for example, if there's a code situation and you're gone for two hours – and you still get your time after that, that would be considered a no lunch. However, if it's a – if you have more than 15 minutes of a break, you get called away, come back, finish the 15 minutes, that's no big deal. That's not considered a no lunch.

(Dep. of Katharina Ickes ("Ickes Dep.") 6-7, ECF No. 68.)  However, Ickes then answered affirmatively when asked if anyone had ever told her that "if you have 15 minutes and then you're called away for a significant period of time and you're able to take 15 minutes later, that that would be considered no lunch."  (*Id.* at 7.)

      Deborah Harchick testified that, although Hoisington never used the word "uninterrupted"

to describe the lunch break to which she was entitled, she assumed that was what was meant:

> [W]hen you are entitled to have a half an hour break it's an
> assumption, I know, without the words uninterrupted prefaced in the
> sentence.  It's understood to me when a lunch break is 30 minutes the
> preferred route would be consecutive minutes, not two minutes, get
> up, go do something, sit down for two minutes, get up, go do
> something and sit down and until you get to 30 minutes.   The
> assumption was from my supervisor when I was hired here that the
> 30-minute break is 30 minutes in a row.  That was my assumption.

(Dep. of Deborah Harchick ("Harchick Dep.") 16, ECF No. 69.)  She also testified that:

> A:    My understanding was if I did not get my 30-minute break I
> was to write in the log book no lunch break so that if I had a
> shortened lunch break that is considered not a lunch break.
> That's considered short.  So I should write in the logbook.
> And I write in the logbook 15-minute lunch break or if I got
> no lunch I'll write no lunch.  But sometimes . . . I'll get a ten-
> or 15- or 20-minute break before I have to go back to work.
> And I'll write in the log book 15-minute break or 20-minute
> break.
>
> Q:    And when you've written in the log book, for example, 15-
> minute break how has your pay been calculated?
>
> A:    I've been paid for a half an hour that I did not take.
>
> Q:    If you were able to take 20 minutes for lunch and then you
> were called away for ten minutes and you were able to return
> and take another ten- or 15-minute break then would you
> report that as not getting lunch?
>
> A:    Yeah.  I would say I didn't get my break, because we were
> told when I first started working here that we were entitled to
> have a 30-minute break for lunch and two 15-minute breaks.
> . . . So if I sit down for lunch and I'm expecting to have a
> half an hour lunch break and I only get a ten- or 15- or a 20-
> minute break then I write in the log book that very thing.
> And I'm thinking that was one of my 15-minute breaks right
> there, so I'm entitled to be paid for the half hour break that I
> did not get.  So I don't feel bad about it or anything.  I just
> tell the truth . . . ."

(*Id.* at 11-12.)

Joyce Deger, a supervisor, testified that when she was interrupted after twenty minutes of eating and came back after being called away to do work and finished her lunch, that she considered this to be a full thirty-minute lunch break.  (Dep. of Joyce Deger ("Deger Dep.") 21, ECF No. 67.) As to what she was told to report, she stated, "If you didn't get your lunch, you were instructed to write in the green book.  I never heard anybody specifically say when your lunch was interrupted." (*Id.* at 22.)  Deger also testified that four to six weeks prior to the deposition, Hoisington told the staff that they should write down interrupted lunches in the logbook, and that was "the first time I ever heard the interrupted lunch, the no lunch," and that she was not surprised by this information. (*Id.* at 30.)

Nicholas D. Velotta ("Velotta"), a staff therapist, testified that:

> A:  [T]hey told me if you miss lunch there's a report book.  Just write it in the book no lunch and put the date down and sign your name. . . . It applies to if you start your lunch and you can't finish it, and it also means if you never were able to take one, either/or.
>
> Q:  So if you sit down to start to eat and you're called away and you can never get back to your lunch?
>
> A:  You could write no lunch.
>
> . . . .
>
> Q:  Now isn't it true that if you start your lunch, you get interrupted and you can come back in ten or 15 minutes and complete your lunch you would not write in the book in that situation?
>
> Mr. Sherman: Objection.
>
> A:  I wouldn't, no.  I don't think it's necessary.
>
> Q:  And you were not trained to in that situation write no lunch in the log book?
>
> A:  No.
>
> Q:  You were not trained regarding interruptions that didn't completely stop your lunch, to report those?
>
> A:  No.

(Dep. of Nicholas D. Velotta ("Velotta Dep.) 24, ECF No. 70.)  However, on cross-examination, Velotta indicated that he understood that he could write down his interrupted lunches in the logbook and be paid for them, and that he chose not to do so because he felt that in those situations he received a full lunch, even with the interruption.  (*Id.* at 40.)  Velotta also indicated that no one at the CCF had told him that "it would be bad" for him to log his interrupted lunches.  (*Id.*)

Erica Corrao, a respiratory therapist, testified that no one at the CCF ever told her that she was entitled to be paid for the whole lunch when her break was interrupted by more than a few minutes.  (Dep. of Erica Corrao ("Corrao Dep.") 9-10, ECF No. 65.)  She further testified that it was her understanding that if she was able to finish her lunch after being called away that that counted as lunch and she would not be paid for it.  (*Id.* at 11.)

### E. Frequency of Missed and Interrupted Lunch Breaks

The parties dispute how often a therapist is interrupted by a page during his lunch break. Hoisington testified that interruptions are

> not a continuous, constant thing where [the employees] are being constantly paged or being called back or being interrupted or having a code blue.  Those things happen over the course of a day, a week, a month.  They could go a week without ever being interrupted one time.  I can't put a number on it, but it's not a daily or a shift occurrence.  It's going to – it's not something that's going to happen and it's inevitable in the course of a day.

(Hoisington Dep. at 150.)

On the other hand, Plaintiff testified that

> you are always disturbed when you have a beeper, you know, you are covering a huge area, and sometimes it's constantly going off, so you are at lunch and the beeper is constantly going off and you have to answer these calls during your lunch.  Or anytime you are there.

-12-

(Berger Dep. at 64.)   Plaintiff also stated that factors such as the number of patients and staff, a therapist's floor assignment and pager assignment, and the number of emergencies and new admissions affect how busy a particular shift is, and consequently how many pages a therapist might receive during lunch.  (*Id.* at 191-92.)  In addition, Plaintiff testified:

> Q:   Do you have any memory of any specific day where your meal period was interrupted by pages?
>
> A:   Well, not specifically, because it happened almost every day. And it all blended in together, so that was part of the job, you know, you have to – it goes off, you answer it immediately. So you go to the phone and call the person and find out what you need to do.

(*Id.* at 187.)

Plaintiff testified that he has no records of how often his meals were interrupted by pages. (*Id.* at 186.)  Defendant alleges that Plaintiff destroyed personal calendars on which Plaintiff  had recorded CCF-related information.  (Def.'s Mot. for Summ. J. at 6, 11.)  However, Plaintiff testified that, although he did keep track of when he worked overtime as well as other personal details, he did not keep track of his meal periods – either on these calendars or in any other form.  (Berger Dep. at 55.)  Plaintiff admitted that either he or his wife "trashed" these calendars before the couple moved from Ohio to Florida on October 20, 2005, and that he discovered that the calendars had been thrown out several months before the move.  (*Id.* at 50.)

Although Plaintiff testified that there is no way to tell from the staffing schedules of floor assignments whether or not he took a meal break on a particular day (*id.* at 121-122), he estimated that, during the last three years of his employment, 80 to 90 percent of his meal breaks were

-13-

interrupted by at least one page,[4] and that 50 percent of those times it was only one page (*id.* at 188, 201).  Plaintiff also estimated that 50 percent of the pages he received during his lunch break required him to get up and do work that could not be resolved over the telephone.  (*Id.* at 190.) Plaintiff stated that he brought food that could be eaten quickly (for example, a sandwich, yogurt, fruit, or bagel) in case he was interrupted and needed to finish his lunch later, which he estimated he was able to do approximately 75 percent of the time.  (*Id.* at 199-200, 206.)  Plaintiff stated that, very rarely, he would take a longer lunch break the next day to make up for an interrupted break, but he said that this was "very infrequent" because the workload became busier over the last few years of his employment.  (*Id.* at 200-201.)  He stated that he never started his shift late or ended it early to make up for an interrupted or missed lunch break.  (*Id.* at 201.)  Plaintiff said that after he was interrupted during lunch, "if I could, I would go right back at the end of the stat, finish [lunch], and then just go on with consult rounds and then go back out onto the floor and do my assignment. And start working on it."  (*Id.* at 200.)

The parties also dispute whether a therapist's daily "consult rounds" infringed on his lunch break.  Hoisington testified that his usual practice is to wait until a therapist has finished lunch before beginning the therapist's consult rounds:

> Q:    Is it common that they may be doing both, they may be having their lunch and doing their consult rounds?
> A:    I try not [to] let that be an issue because I just tell them I'm available when you are done, but there are people that eat during the same time.  That happens.  I like to stay in one room and let them eat in the break room, away from them, if I can.

---

[4]    Later in his deposition, Plaintiff estimated that 75 to 85 percent of his lunches were interrupted.  (Berger Dep. at 201.)

-14-

(Hoisington Dep. at 32-33, ECF No. 64, at tab A7.)  On the contrary, Plaintiff's testimony implies

that the supervisors pressured the therapists to finish eating their lunch and immediately do their

consult rounds, whether or not their thirty-minute meal period was over.

> Q:   Is it your testimony that consult rounds were done during the meal period?
> A:   Yes.
> Q:   Not after the meal period?
> A:   Well, I would say after, but it was kind of like [they] put pressure on you to get it done, and you were there, you finished your sandwich or – and then you walked in and you discussed your rounds.
> Q:   And who put that pressure on you?
> A:   Whoever was on duty who were [sic] doing the rounds.
> Q:   Which would be who?
> A:   That would be Jim Karol or Ed Hoisington.  He, you know, he would say, oh, it's okay, you know, just go ahead, finish your sandwich, so I finished my sandwich and then I would come in and do the rounds.
> . . . .
> Q:   How did Jim Karol or Ed Hoisington put pressure on you to finish your sandwich so that you could go on [your] consult round?
> A:   Well, they would show up with the thick papers from, that they printed up from all the assignments and they would want to go through that with us.
> Q:   Any other way they put pressure on you?
> A:   No.  Or, you know, he would let me do it when I finished, but, you know, its not like – you know, I finished my sandwich, I had, I had made my lunches in a way so that I could eat them in less than five minutes.
> Q:   Any other way they pressured you?
> A:   Not that I recall.

(Berger Dep. at 205-6, ECF No. 64, at tab A1.)

### F. Compensation for Plaintiff's Missed and Interrupted Lunch Breaks

On September 21, 2001, Plaintiff noted "no lunch" in the logbook.  (Respiratory Therapy

Time Clock Log Sheet, ECF No. 40, at tab B(3).)  Plaintiff was credited an extra thirty minutes on

-15-

this date.  (Time and Attendance Record, ECF No. 40, at tab B(4).)  The payroll records indicate that

Plaintiff was reimbursed for this time.[5]  (*See* Payroll History Report, ECF No. 40, at tab B(5).)  In

addition, the CCF's Payroll Manager, Thomas Malinowski, relying on the payroll records, testified

that "the additional thirty minutes, representing Plaintiff's reportedly missed meal period, was

included in his working hours and Plaintiff was, in fact, appropriately compensated."  (Unsworn

Decl. of Thomas Malinowski ¶ 5, ECF No. 40, at tab C(2).)  As Plaintiff does not mention this

instance in his briefings, the court assumes that it is undisputed.

Plaintiff testifies that he wrote "no lunch" in the logbook "five to seven times," in or around

2002,[6] yet he was never paid for that time.

> Q:    Have you ever written no lunch in the logbook?
> A:    Yes, many years before.
> Q:    How many years before?
> A:    It could have been three years.  I don't, I don't know for sure.
>        I didn't write it down at the time.
> Q:    You didn't write it down on your calendar?
> A:    No, I didn't.
> Q:    You didn't write it down on your board, on your –
> A:    No.
> Q:    – bulletin board?
> A:    No.
> . . . .
> Q:    When did you write no lunch in a logbook?
> A:    It may have been more than three years ago, or
>        approximately three years ago.
> Q:    But not sooner than three years ago?
> A:    I can't say for sure.  I can't be precise on that.

---

[5]    In addition to the missed lunch on September 21, 2007, Plaintiff was also credited for
1.25 additional overtime hours (on September 27, 2001), during this pay period.  (*See*
Time and Attendance Record.)  On the payroll records, the extra time for these dates is
listed as September 22 and September 29.  (Payroll History Report.)

[6]    At Plaintiff's deposition on November 18, 2005, he stated that he wrote "no lunch" in
the logbook approximately three years ago.  (*Id.* at 64, 184.)

-16-

Q:     And your testimony is when you wrote no lunch in a logbook, you did not get paid for that no lunch?

A:     Yes.

Q:     How many times did that occur?

A:     That happened several times.  I didn't keep track, but it got to be ridiculous, so I just, you know, just assumed that it would continue to happen and I didn't want to press the matter.

Q:     What do you mean by several times?  How many is that?

A:     Three or more.

Q:     Three to a hundred or three –

A:     No, I would say it's –

Q:     – to six?

A:     After it kept happening that I didn't get paid for it, you know, I assumed that it would continue to happen, so I didn't bother.

Q:     How many times did you write it down and not get paid for it?

A:     I would say a minimum of five.

Q:     And a maximum of?

A:     It's somewhere in the same range, five to seven times, I would say, the last time I was attempting to do things like that.

Q:     All more than three years ago?

A:     It could have been.

. . . .

Q:     . . . . How long ago were you writing in the logbook no lunch and you were not being paid?

A:     It was at least three years ago.

Q:     Three years or longer?

A:     It's possible.

Q:     Earlier than three years?

A:     I don't think so.

(*Id.* at 63-65, 184.)  Plaintiff never told anyone in payroll that he had not been properly paid for his missed lunch breaks.  (*Id.* at 69.)  However, he stated that on approximately three occasions, "years before," he did tell his supervisor at the time, John Burkhart ("Burkhart"), that his paychecks were incorrect because they did not include time for missed lunch breaks, and that Burkhart gave him a dirty look and did not obtain reimbursement for Plaintiff.  (*Id.* at 64, 71, 184.)  Plaintiff did not bring

-17-

the issue to any of Burkhart's superiors because he "didn't want to rock the boat."  (*Id.* at 185.)

Burkhart's, and later Hoisington's, supervisor Doug Orens ("Orens"), who happens to be Plaintiff's

cousin.[7]  (*Id.* at 46-47, 185-186.)  Plaintiff has never used the CCF's Employee Right of Review

procedure, which was included in his employee handbook.  (*Id.* at 94-95; *see* Employee Right of

Review, ECF No. 40, at tab B(2).)  Plaintiff testified that he complained to someone in Human

Resources ("H.R.") about not being reimbursed for missed lunches – although he cannot remember

when or to whom – who told him that "every department has their own rules" and would not talk to

him about it.  (Berger Dep. at 72.)

Plaintiff also argues that logging the missed meal breaks was futile because they were rarely

reimbursed:

> It was a rarity that, when you put it in there, that you were paid for
> it, and it got to be ridiculous to ask for it and it would never show up,
> or rarely show up on your paycheck, and if you asked about it, you
> got dirty looks.

(*Id.* at 63.)  Similarly, he also stated:

> I do recall there were number of times when I had asked about [the
> logbook] and I didn't see it and they just looked at me and gave me
> a hard time and I wasn't paid like for lunches, and it got very tiring
> putting my name down on the book for lunches and then I wouldn't
> be paid for it, so I just said it's part of my job, I'm just going to have
> to deal with it.  And maybe I'll be out of here soon.

(*Id.* at 157.)  Plaintiff states that the therapists casually discussed the fact that they were not

reimbursed for missed lunch breaks and that "it got to be a joke to request [reimbursement]."  (*Id.*

---

[7]     Plaintiff stated that he is not close with his cousin, although Plaintiff "tried [to form a
relationship] a number of times," because they have nothing in common.  (*Id.* at 186.)
Plaintiff also stated that Orens is very cold, that "nobody can talk to him," and that Orens
did not care and would not be interested in Plaintiff's problem.  (*Id.* at 185-86.)

at 68-69.)  However, the sample log sheets indicate that many other therapists frequently reported "no lunch" in the logbook.  (See Sample Log Sheets, ECF No. 64, at tab B7.)

Plaintiff says that he did not log his interrupted lunches because the CCF did not train him to do so.  (Berger Decl. ¶¶ 3-6.)

During Plaintiff's deposition, Defendant also asked him about his non-lunch break overtime. Defendant pointed out each logbook sheet on which Plaintiff had indicated that he was due overtime or "paid time off" and, for each instance, Plaintiff stated whether he was paid, or assumes that he was paid (Berger Dep. at 139-153, 156, 159-163, 169, 171, 174, 176, 180) or whether he did not remember whether he had been paid.  He said that his lack of memory was due to the fact that some of his marks were initialed by a supervisor and some were not, so only the pay stubs – which were not available – would conclusively show whether he was actually paid for these periods.  (*Id.* at 153, 156, 161-168, 170, 172-73, 175-76, 178-79, 181.)  He also stated that if he had not been paid for overtime, which he kept track of on a calendar, then he might have brought that fact to someone's attention "if [he] remembered."  (*Id.* at 157.)

Plaintiff retired from the CCF on or about March 31, 2005.  (*Id.* at 25.)

### G. The Instant Lawsuit

Plaintiff filed the instant suit on May 27, 2005.  (Pl.'s Compl. and Civil Cover Sheet, ECF No. 1.)  Plaintiff alleges that Defendant violated the FLSA, the Ohio Minimum Fair Wage Standards Act, and his employment contract by not providing him with a thirty-minute uninterrupted lunch break each day.  Plaintiff also alleges that he was not compensated for lunch breaks that he missed entirely due to his workload, even when he informed his supervisor and/or indicated "no lunch" in the logbook.  Plaintiff also says that he was never told that he could record his interrupted lunches,

-19-

and that the CFF policy did not count an interrupted lunch as a compensable "no lunch."  According to Plaintiff, this lack of a "bona fide meal period" means that "Plaintiff and his colleagues regularly work one-half hour more per shift than they are compensated for." (Pl.'s Am. Compl. ¶ 2.)  He seeks overtime compensation for all of his unpaid lunch periods for the past three years of his employment as well as liquidated damages.  (*Id.* at 10.)

On May 1, 2006, Plaintiff filed the pending Motion for Collective and Class Action Certification.  (ECF No. 20.)  On June 9, 2006, Defendant filed the pending Motion for Summary Judgment.  (ECF No. 38.)

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."  *Id*. at 252.  However,

"[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Scheibil,* 188 F.3d 365, 369 (6th Cir. 1999).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show "more than a scintilla of evidence to overcome summary judgment"; it is not enough to show that there is slight doubt as to material facts. *Id.*

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e).

### III. LAW AND ANALYSIS

As the disposition of Defendant's Motion for Summary Judgment will determine whether Plaintiff's Motion for Class Certification is moot, the court will discuss the former issue first. *See Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 616 (6th Cir. 2002) (affirming a district court's decision to grant the defendants' motion for summary judgment and then deny as moot

plaintiffs' pending motion for class certification on the ground that "a district court is not required to rule on a motion for class certification before ruling on the merits of the case").

## A. Motion for Summary Judgment

As an initial matter, the court notes that, for the purposes of summary judgment, the court must credit Plaintiff's testimony that he did not keep track of his meal periods on any calendars or in any other manner. Consequently, the fact that either Plaintiff or his wife threw out calendars on which he kept track of certain work and personal details does not bear on the pending motions. As stated in the court's Order of July 14, 2006, spoliation of evidence is not an affirmative defense, and the facts "regarding how Plaintiff kept track of his time, including that the calendars on how he kept his time have been destroyed . . . [are] part of the general evidence in the case . . . . [and these issues are] more appropriately addressed in the context of a motion in limine." (Order, ECF No. 54, at 3.)

### 1. General Principles Under the FLSA

The FLSA requires an employer to compensate an employee at a higher rate for any hours worked in excess of the regulated forty-hour work week. 29 U.S.C. § 207(a)(1). As a threshold requirement for recovering unpaid wages under the FLSA, the plaintiff must show: (1) the existence of "an employer-employee relationship between the relevant parties within the meaning of the Act"; and (2) "that the parties were engaged in activities covered by the Act." *Herman v. Palo Group Foster Home*, 976 F. Supp. 696, 701 (W.D. Mich. 1997); *see Kowalski v. Kowalski Heat Treating Co.*, 920 F. Supp. 799, 806 (N.D. Ohio 1996). The parties do not dispute that Plaintiff satisfies these two requirements.

To meet his prima facie case, the employee also bears the burden to prove that he is entitled to work for which the employer did not compensate him. *Myers v. Copper Cellar Corp.*, 192 F.3d

-22-

546, 551 (6th Cir. 1999); *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946). An employer is required to keep accurate records of the "wages, hours, and other conditions and practices" pertaining to its employees. 29 U.S.C. § 211(c); *see* 29 C.F.R. § 516.2(a)(7) ("Every employer shall maintain and preserve payroll or other records containing the following information and data with respect to each employee . . .: [h]ours worked each workday and total hours worked each workweek . . . ."). Consequently, a plaintiff may demonstrate his uncompensated work by referencing an employer's time records. *Myers*, 192 F.3d at 551 & n.8 (citing § 211(c)). A plaintiff who shows that the employer's records are inaccurate or inadequate is subject to a lesser burden, in which he must show only "that he has in fact performed work for which he was improperly compensated and . . . sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* at 551 (quoting *Anderson*, 328 U.S. at 687). The employer then has the burden to refute the inference. *Id.* Plaintiff does not dispute that he must also prove that Defendant had actual or constructive knowledge "that [Plaintiff] was working overtime." *Wood v. Mid-America Mgmt. Corp.*, 192 F. App'x 378, at *8-*9 (6th Cir. 2006); (*see* Pl.'s Surreply Br. 7, ECF No. 81.)

### 2. Accuracy of the CCF's Time Records

The first issue before the court is whether the CCF's time records are accurate. The outcome of this issue will determine how heavy a burden Plaintiff must meet to demonstrate his uncompensated work.

#### a. Missed Lunches

Plaintiff first argues that Defendant's time records are inaccurate because the time records do not reflect the days on which Plaintiff alleges that he missed his lunch break. It is undisputed that

Defendant maintained a logbook in which employees were told to mark when they missed their entire lunch period, for which employees would then purportedly be compensated.  Yet Plaintiff admits that he purposely stopped marking his missed lunches in the logbook.  As such, Defendant's failure to record Plaintiff's alleged missed lunches – with the exception of the handful of "no lunches" that he testified to recording – is due to Plaintiff's own failure to mark them in the logbook. Courts have denied recovery under similar circumstances, and Plaintiff does not cite any authority to the contrary.  The Sixth Circuit has stated that "an employee cannot undermine his employer's efforts to comply with the FLSA by consciously omitting overtime hours for which he knew he could be paid." *Wood*, 192 F. App'x 378, at *9; *accord Forrester v. Roth's I.G.A. Foodliner, Inc.*, 475 F. Supp. 630, 634 (D. Or. 1979) (estopping plaintiff from recovery where he "prevented the [employer] from complying with the Act by failing to report his overtime hours accurately"), *aff'd*, *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414-415 (9th Cir. 1981) ("An employer must have an opportunity to comply with the provisions of the FLSA. . . . [W]here the acts of an employee prevent an employer from acquiring knowledge, here of alleged uncompensated overtime hours, the employer cannot be said to have [violated the FLSA].").  The court finds that, viewing the facts in Plaintiff's favor, there is no dispute that Defendant informed Plaintiff that he could be reimbursed for missing full lunch breaks, yet Plaintiff intentionally did not report his missed lunches on the ground that it was "futile" to do so because he would not be reimbursed for them.

Plaintiff's "futility" argument is not well-taken for two reasons.  First, Plaintiff admits that he was compensated for numerous instances in which he worked overtime, and the record indicates that he was reimbursed for a missed lunch on September 21, 2001, all of which he had noted in the logbook.  These examples demonstrate that recording one's work deviations was not futile.  Second,

-24-

ceasing to keep track of one's missed lunches does not solve the problem of not being reimbursed, but instead precludes the possibility of future reimbursement by preventing the employer from discovering the unpaid work.  Therefore, the court finds that Plaintiff's alleged missed lunches do not demonstrate that Defendant's time records are inaccurate.

Plaintiff next contends that Defendant's records are inaccurate because they do not include the approximately five to seven "no lunches" that Plaintiff says he marked in the logbook in or around 2002 for which he was never compensated, despite his complaints to his supervisors and H.R.  Even assuming that Plaintiff did complain about not being paid for missed lunches, Plaintiff does not submit any evidence to support his allegation that he reported these "no lunches," nor does he provide even a minimum level of details about when these unpaid instances occurred.  The court finds, therefore, that Plaintiff has not met his burden on summary judgment to present more than a scintilla of evidence that he was not compensated for any missed lunches.  As such, the court grants Defendant's Motion for Summary Judgment on the issue of Plaintiff's missed lunches.  Furthermore, the court declines to find that Defendant's time sheets are inaccurate for failure to include some vague, unspecified instances of missed lunches.

### b. Interrupted Lunches

Plaintiff also contends that Defendant's records are inaccurate because they do not include the days on which his lunch period was interrupted or cut short due to having to respond to pages and other work.  Testimony from Hoisington and Orens support Defendant's assertion that employees were told to record both their missed and interrupted lunches in the logbook and that they were compensated for a full thirty-minute lunch any time they reported an interrupted lunch. (Hoisington Dep. at 83-85; Orens Dep. at 64.)  In addition, the CCF Policy states: "If, due to the

operational needs of the department, *the meal period cannot be taken or is shorter than scheduled*, this must be indicated on the timekeeping document and computed in the daily elapsed time." (CCF Policy # 430.)  However, Plaintiff avers that the CCF did not train Plaintiff to report interrupted lunches and that, instead of compensating employees for interrupted lunches, Defendant told them to finish their lunch break after any interruptions, and that these interrupted breaks then counted as lunch, for which they were not paid.  (Berger Decl. ¶¶ 3-5.)  Plaintiff further states that it was the employees' practice to not report interrupted lunches.  (*Id.* ¶ 6.)

Several employees testified as to what Hoisington told them about reporting missed lunches. Although Harchick said that she assumed "missed lunch" included interrupted lunches, and she utilized the logbook accordingly, (Harchick Dep. 11-12, 16), other employees stated that their understanding of the CCF's lunch break policy was that it did not include interrupted lunches. (Deger Dep. at 21.)  For other employees, the length and/or nature of the interruption affected whether they thought they could report an interrupted lunch.  (Ickes Dep. at 6-7.)  No CCF employee testified that Hoisington ever expressly stated that interrupted lunches should be counted as missed lunches, although Deger testified that Hoisington had made an announcement to that effect after the lawsuit was filed.  (Deger Dep. at 30.)

Construing the facts in Plaintiff's favor, a reasonable juror could conclude that Plaintiff was not instructed to record his interrupted lunches.  Therefore, Defendant's Motion for Summary Judgment is denied.  The outcome of this issue will determine whether Plaintiff's case goes forward. As it is undisputed that Plaintiff did not record his interrupted lunches, if a jury finds that Plaintiff was instructed to do so, then Plaintiff's claim fails because he would have prevented the CCF from discovering Plaintiff's uncompensated lunches, as he did with regard to the alleged missed lunches.

-26-

However, if a jury finds that the CCF did not instruct Plaintiff to record his interrupted lunches, then Defendant's records are inaccurate as a matter of law.  Plaintiff correctly states that the employer's legal duty to keep records of employees' work hours "is neither delegable nor dischargeable."  *Majchrzak v. Chrysler Credit Corp.*, 537 F. Supp. 33, 37 (E.D. Mich. 1981). Plaintiff cites three cases in which courts found that defendant employers had failed to fulfill their duty to record time records.  *Herman v. Palo Group Foster* Home, 183 F.3d 468 (6th Cir. 1999) (employer willfully failed to record accurate number of hours employees worked each day and week in light of notice of previous violations); *United States Dep't of Labor v. Cole Enters., Inc.*, 62 f.3d 775, 779 (6th Cir. 1995) ("The employees were told by [the employer] to record only the scheduled shift hours on their time sheets, for example, 6:00 a.m. to 2:30 p.m., not their actual hours worked."); *Majchrzak*, 537 F. Supp. at 37 ("[L]ower management's practice did not permit plaintiff to record all overtime hours actually worked but rather only those overtime hours which were "approved" prior to their actual working.").  Like these cases, if Defendant did not allow Plaintiff to report his interrupted lunches, then Defendant effectively omitted hours from its time records for which Plaintiff worked yet was not compensated.  Plaintiff's failure to provide specific dates on which his lunch was interrupted and the total amount of unpaid work would, in this scenario, be excusable due to Defendant's policy to not allow Plaintiff to report interrupted lunches.  As such, for purposes of the within motion, there is a genuine issue of material fact as to whether the CCF's records are inaccurate or incomplete, and therefore Plaintiff must show only "that he has in fact performed work

for which he was improperly compensated and . . . sufficient evidence to show the amount and extent

of that work as a matter of just and reasonable inference."  *Myers*, 192 F.3d at 551 & n.8.[8]

### 3. Just and Reasonable Inference

Defendant next argues that, even if the court finds its records inaccurate or incomplete,

Plaintiff cannot carry his low burden of proof because he has provided only "non-specific general

estimates of the number and frequency of his allegedly interrupted . . . lunches."  (Def.'s Mot. for

Summ. J. at 11.)

Under this lower burden of proof, an employee need not prove the amount of his unpaid work

with "the exactness and precision of measurement that would be possible had [the employer] kept

[proper] records . . . .  It is enough under these circumstances if there is a basis for a reasonable

inference as to the extent of the damages."  *Anderson*, 328 U.S. at 688.  In addition,

> [r]ecovery under the FLSA should not be denied because proof of the
> number of hours worked is inexact or not perfectly accurate.  Where
> an employee has demonstrated he was improperly compensated for
> some work performed, he has a right to recovery even [though] the
> amount may be uncertain and damages difficult to calculate.

*Mendez v. Brady*, 618 F. Supp. 579, 587 (W.D. Mich. 1985) (citations omitted).

Here, rather than pointing out a single instance of an uncompensated interrupted lunch,

Plaintiff made general, uncorroborated estimates during his deposition.  Plaintiff testified that 80 to

---

[8]     However, the court also notes that if Defendant *did* instruct Plaintiff to record his
interrupted lunches, Defendant did not improperly delegate the task of maintaining
accurate time records to the therapists by requiring them to mark down their time
variances in the logbook.  An employer is permitted to require an employee to report his
time variances, and to rely on the employee's reported time as accurate.  *See Wood*, 192
F. App'x 378 (holding that employer did not have knowledge that employee was
working unpaid overtime where he did not report all his hours on his time sheets as the
employer instructed).

90 percent of his meal breaks were interrupted by at least one page, and that approximately 75 percent of the time he was able to finish his lunch later.  He also stated that, when his lunch was interrupted by a page, 50 percent of the time it was only one page, and 50 percent of the pages he received during his lunch break required him to get up and do work that could not be done over the phone.  According to Plaintiff's estimates, 10 to 20 percent of his total lunches were not interrupted at all; 40 to 45 percent of his total lunches were interrupted once; and 40 to 45 percent of his total lunches were interrupted more than once.  A simple calculation reveals that Plaintiff testifies that he was able to take his full lunch break (whether all at once or finishing it later) 70 to 87.5 percent of the time, and that 12.5 to 30 percent of Plaintiff's lunches were interrupted to such an extent that he did not receive a full lunch.  In addition, Plaintiff testified that he sometimes performed his consult rounds during his thirty-minute lunch break.

The court notes that Plaintiff's evidence in support of his claim for uncompensated interrupted lunches, as stated above, is borderline.  However, although "the court need not accept every element of the plaintiffs' case simply because the defendants' records were found to be inaccurate," *Mendez*, 618 F. Supp. at 586, the issues of credibility that this case presents must be dealt with at trial, not on summary judgment.

### 4. The CCF's Knowledge of Plaintiff's Interrupted Lunch Breaks

As a genuine issue of material fact exists as to whether Plaintiff was instructed or allowed to report his interrupted lunches (as opposed to just his missed lunches), the court finds that Defendant is precluding from obtaining summary judgment on the ground that it lacked knowledge about Plaintiff's alleged interrupted lunches.  (*See* Pl.'s Opp'n Br. at 14, 15; Pl.'s Surreply Br. at 8.)

### 5. Predominant Benefit Test

-29-

Plaintiff argues that instead of receiving one unpaid "bona fide meal period" consisting of thirty consecutive minutes, he was forced to take two or more shorter breaks that added up to thirty minutes, consequently, each constitute compensable "rest breaks."  Defendant oppositely argues that, even where the total minutes are not taken consecutively, a lunch break can be considered "bona fide" where the time is spent predominantly for the employee's benefit.  As discussed below, Defendant is correct.

Under the FLSA, "bona fide meal periods" are not counted as time worked, and are therefore not compensable, whereas "coffee breaks or time for snacks . . . are rest periods," and are therefore compensable as time worked.  29 C.F.R. § 785.19(a).  To constitute a "bona fide meal period":

> [t]he employee must be completely relieved from duty for the purposes of eating regular meals.  Ordinarily 30 minutes or more is long enough for a bona fide meal period.  A shorter period may be long enough under special conditions.  The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating.

*Id.*  It is well-settled that the Sixth Circuit applies the "predominant benefit" test to determine whether an employee's meal period is compensable.  *Myracle v. Gen. Elec. Co.*, No. 92-6716, 1994 U.S. App. LEXIS 23307, at *10-*13 (6th Cir. 1994); *F.W. Stock & Sons v. Thompson*, 194 F.2d 493, 496-97 (6th Cir. 1952) (citing *Armour & Co. v. Wantock*, 323 U.S. 126 (1944)).  Under this test, the employee bears the burden to prove that the normally uncompensable meal period should be compensable because it is spent predominantly for the employer's benefit.  *Myracle*, No. 92-6716, 1994 U.S. App. LEXIS 23307, at *13 (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946)).

Plaintiff argues that the predominant benefit test is not applicable to the alleged interrupted lunch breaks because the test applies only to "bona fide meal periods" of at least thirty minutes,

-30-

whereas Plaintiff's lunch breaks were interrupted by work, thereby transforming them instead into two smaller "rest breaks."  Plaintiff cites no authority for its assertion that "[a]pplication of the 'predominant benefit' test is proper only where an employee was actually provided with a meal period of thirty continuous minutes, but was required to perform some act or acts for the benefit of the employer during that period."  (*Id.* at 16) (emphasis omitted).  Although the language of Section 785.19(a) could be read to favor Plaintiff, by providing that "[o]rdinarily 30 minutes or more is long enough for a bona fide meal period," Sixth Circuit precedent precludes Plaintiff's argument.  In *Myracle*, the Sixth Circuit rejected the plaintiffs' assertion that their twenty-minute lunch breaks were presumptively compensable because they were shorter than the break described in Section 785.19(a).  Quoting the district court, the Sixth Circuit stated that "[w]hile the regulations of the Department of Labor, adopted by the Wage-Hour Administrator, may be considered by the court in cases such as the one at bar, they do not represent legal standards which the court is bound to follow."  *Myracle*, No. 92-6716, 1994 U.S. App. LEXIS 23307*, at *18; *Reich v. South. New England Telecomms. Corp.*, 892 F. Supp. 389, 400 (D. Conn. 1995).  It follows logically that if the regulations are not dispositive as to the duration of the break, that neither are they dispositive as to the non-consecutive nature of the break.  Consequently, the court must look to applicable case law.

Turning to the case law, both of the cases on which Plaintiff relies for the proposition that interrupted meal breaks are automatically compensable are distinguishable. In *Brown v. L&P Indus.*, No. 5:04CV0379 JLH, 2005 U.S. Dist. LEXIS 39920, at *16 (D. Ark. Dec. 21, 2005), the Eastern District of Arkansas held that the employer "was entitled to deduct lunch breaks from [the employee's] working hours only if she was completely relieved of all duties during that time." However, *Brown*'s use of the "completely relieved from duty" standard contradicts the Sixth

Circuit's "predominant benefit test," so this case is inapposite. Plaintiff also cites *Herman v. Palo Group Foster Home, Inc.*, 183 F.3d 468, 473 (6th Cir. 1999), in which the Sixth Circuit held that the employees' meal breaks were compensable where the "meal times were often less than thirty minutes and were constantly interrupted." However, the *Herman* court made this finding in the context of affirming summary judgment for the employee, whereas here the court is denying summary judgment for the employer. As *Herman*'s holding is based on the court's definitive factual findings, the case is inapplicable to the instant case, in which a genuine issue of material facts exists as to whether Plaintiff's lunch breaks were interrupted and, if so, how often and to what extent. Therefore, Plaintiff's argument that interrupted lunch breaks are presumptively compensable as rest breaks is not well-taken, and these breaks are therefore subject to the predominant benefit test.

Under the predominant benefit test, the question is not whether the CCF received a benefit from having the therapists on call during lunch, but whether Plaintiff is "engaged in the performance of any substantial duties" during his lunch break. *Myracle*, No. 92-6716, 1994 U.S. App. LEXIS 23307, at *15. While it is true that "inactive duty may be duty nonetheless," *id.*, and that "waiting for something to happen, or 'readiness to serve. . . .'" can constitute substantial duties, *id.* at *16 (quoting *Armour*, 323 U.S. at 133), the Sixth Circuit has also held that "[a]s long as the employee can pursue his or her mealtime adequately and comfortably, is not engaged in the performance of any substantial duties, and does not spend time predominantly for the employer's benefit, the employee is relieved of duty and is not entitled to compensation under the FLSA." *Hill v. United States*, 751 F.2d 810, 814 (6th Cir. 1984). The Supreme Court has held that the predominant benefit test is "dependent upon all the circumstances of the case." *Armour*, 323 U.S. at 133. The Sixth

-32-

Circuit has similarly held that the standard for compensability needs to remain "flexible and realistic" and "based on the particular circumstances of [the] case." *Hill*, 751 F.2d at 814.

Much of the authority on which Plaintiff relies in support of its argument that the interrupted lunch breaks are compensable is case law from other jurisdictions that either applies the "completely relieved of duty" test rather than the predominant benefit test, *see, e.g.*, *Hoffman v. St. Joseph's Hosp.*, No. 1:97-CV-0753-RLV, 1998 U.S. Dist. LEXIS 7911 (N.D. Ga. Apr. 14, 1998), *vacated on other grounds*, 1999 U.S. Dist. LEXIS 23316 (N.D. Ga. July 26, 1999); *Rotondo v. City of Georgetown*, 869 F. Supp. 369 (D.S.C. 1994), or puts the burden of proof on the opposite party than does the Sixth Circuit, *see, e.g.*, *Bernard v. IBP, Inc. of Neb.*, 154 F.3d 259 (5th Cir. 1998); *Burgess v. Catawba County*, 805 F. Supp. 341 (W.D.N.C. 1992).

Construing the facts in Plaintiff's favor, he was able to choose when to take his lunch break and he could go anywhere within the CCF's large campus. The fact that he was required to carry a pager with him does not, by itself, make his lunches compensable. *See, e.g.*, *Myracle,* No. 92-6716, 1994 U.S. App. LEXIS 23307, at *16 (affirming district court's finding that mechanics' meal period was uncompensable where they were sometimes paged during lunch and remained responsible for the product produced from the machines they operate but "[w]ithin loose limits, plaintiffs are free to choose the time and place of their meal periods" and "[t]o the extent that plaintiffs are occasionally interrupted . . ., these interruptions are *de minimis*"); *Roy v. County of Lexington*, 141 F.3d 533, 545 (4th Cir. 1998) (holding that EMS workers' lunch breaks were not predominantly for the employers' benefit, and therefore uncompensable, where "[t]he written EMS personnel policy expressly provides that meal periods 'must not be interrupted' except for emergencies" and "EMS employees could go anywhere within their 82 square-mile response zones

-33-

during mealtime"); *Agner v. United States*, 8 Cl. Ct. 635, 638 (1985), *aff'd*, 795 F.2d 1017 (Fed. Cir. 1986) (holding that the requirement that employees carry a radio with them to "respond to calls from supervisors" actually "enhance[d] employees' freedom during the lunch break").

However, the court notes that, construing the facts in Plaintiff's favor, Plaintiff's interruptions, at least at times, may have been more than just *de minimis*, that he received frequent pages that were not only for emergencies, and he sometimes had to do his consult rounds during his thirty-minute lunch break.  Furthermore, according to Plaintiff's estimates, 12.5 to 30 percent of Plaintiff's lunches were interrupted to such an extent that he did not receive a full lunch.  As such, the court finds that a genuine issue of material fact exists as to whether Plaintiff's lunch breaks were predominantly for Defendant's benefit and should therefore be compensable.

### 6. Violation of the Ohio Minimum Fair Wage Standards Act

The parties correctly state that Plaintiff's claim under section 411.03(A) of the Ohio Minimum Fair Wage Standards Act is governed by the same standards as the FLSA.  Consequently, "the merits of [Plaintiff's] federal and state overtime claims are indistinguishable."  *Whisman v. Ford Motor Co.*, 157 F. App'x 792, 796 (6th Cir. 2005); *see Pritchard v. Dent Wizard Int'l Corp.*, 210 F.R.D. 591, 596 (S.D. Ohio 2002).  As such, summary judgment is denied as to Plaintiff's state claim for interrupted lunches and granted as to Plaintiff's state claim for missed lunches.

### 7. Breach of Employment Contract

Plaintiff's third cause of action is that "Defendant breached its contractual obligations to the Plaintiffs by failing to pay them for hours worked."  (Pl.'s Am. Compl. ¶ 39.)  Defendant moves for summary judgment on this claim because Plaintiff admits that he is an at-will employee and that he has never had a contract with the CCF.  (*See* Berger Dep. at 40-41.)

It is well established that one of the elements a plaintiff must prove to establish a breach of contract claim is "the existence of a contract, which requires an offer, acceptance, and consideration." *Moore v. Fairfield County Sheriff's Dep't*, No. C-2-02-748, 2004 U.S. Dist. LEXIS 27633, at *23 (S.D. Ohio Jan. 6, 2004) (quoting *Kirkland v. St. Elizabeth Hosp. Med. Ctr.*, 34 F. App'x 174, 178 (6th Cir. 2002)).  In *Moore*, the court granted summary judgment to the employer on the employee's breach of contract claim for unpaid overtime hours where the employee could not prove the existence of a contract that allowed the employee "to accrue more than 480 hours of compensatory time." *Id.* at *24.  In *Simmons v. Wal-Mart Assocs. Inc.*, No. 2:04-CV-51, 2005 U.S. Dist. LEXIS 21772, at *32 (S.D. Ohio 2005), an Ohio district court granted summary judgment for the employer on the employee's breach of contract claim on the grounds that the court had already granted summary judgment on the employee's FLSA claim and also that "[p]laintiff was an 'at will' employee not covered by any written employment contract."  Furthermore, Plaintiff's reliance on *Lauture v. IBM*, 216 F.3d, 261-62 (2d Cir. 2000), and *Walker v. Abbott Labs.*, 340 F.3d 471, 476 (7th Cir. 2003), is misplaced because those cases stand for the proposition that an at-will employment arrangement can constitute a contractual relationship for the purposes of a claim under 42 U.S.C. § 1981.  Therefore, as Plaintiff has not provided any proof of an employment contract, the court grants summary judgment to Defendant on Plaintiff's breach of contract claim.

### B. Collective Certification Under the FLSA

Plaintiff seeks to certify his FLSA claim as a collective action.  As the court has already granted summary judgment for Defendant on the FLSA claim based on missed lunches, his motion for certification is denied as moot as to this claim.  For the reasons that follow, the court hereby certifies Plaintiff's FLSA claim based on his interrupted claims as a collective action.

-35-

Plaintiff's proposed class is defined as follows:

> All non-exempt respiratory therapists employed by The Cleveland Clinic Foundation who, since May 1, 2002, have not been afforded a bona fide meal period of at least 30 minutes per shift, and who have therefore worked without receiving compensation.

(Pl.'s Am. Compl. ¶¶ 18, 19.)  Section 29 U.S.C. § 216(b) provides that an action may be brought under the FLSA

> by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

As such, a plaintiff must meet two requirements to bring a collective action under the FLSA: (1) "the plaintiffs must actually be 'similarly situated'" and (2) "all plaintiffs must signal in writing their affirmative consent to participate in the action."  *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006).  Thus, similarly situated class members must "opt in" to a § 216(b) collective action, whereas class members must "opt out" in a class action under Federal Rule of Civil Procedure 23. *Id.*

Courts use a "two-phase inquiry" to determine whether to certify a collective action under the FLSA.  Prior to discovery, in what is called the "notice" phase, the plaintiff's burden is "fairly lenient:"

> The plaintiff must make only a "modest factual showing sufficient to demonstrate that [the plaintiff] and potential plaintiffs together were victims of a common policy or plan that violated the law." [Comer, 454 F.3d] at 547 (quoting *Roebuck v. Hudson Valley Farms, Inc.*, 239 F. Supp. 2d 234, 238 (N.D.NY. 2002)).  Courts evaluating the plaintiff's factual showing during the conditional certification phase may consider "whether potential plaintiffs were identified; whether affidavits of potential plaintiffs were submitted; and whether evidence of a widespread discriminatory plan was submitted."

-36-

> *Smith*, 2005 U.S. Dist. LEXIS 9763, at *10 (internal citations omitted).  If the plaintiff successfully makes the modest factual showing necessary for conditional certification, then the court may play a role in ensuring that potential opt-in plaintiffs receive timely, accurate, and informative notice.  *See Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170-72, 110 S. Ct. 482, 107 L. Ed. 2d 480 (1989).

*Williams v. Le Chaperon Rouge*, No. 1:07-CV-829, 2007 U.S. Dist. LEXIS 59338, at *5-*6 (N.D. Ohio Aug. 14, 2007) (first brackets in original).  After discovery has been completed, the court conducts the second phase of the class certification process.  *Id.* (citing *Comer*, 454 F.3d at 547).  Because "the court has more information about the plaintiff and potential class members . . . . [d]uring this phase, the court employs a stricter standard to determine whether the plaintiff and the class members are similarly situated.  *Id.* (citing *Morisky v. Pub. Serv. Elec. & Gas. Co.*, 111 F. Supp. 2d 493, 497 (D. N.J. 2000)).  In addition, "the defendant may move to decertify the class, making a 'fact-specific inquiry' into the plaintiff's showing that she is similarly situated to the opt-in plaintiffs.  *Id.* (citing *Goldman v. Radioshack Corp.*, No. 03-CV-0032, 2003 U.S. Dist. LEXIS 7611 at *27, 2003 WL 21250571, at *8 (E.D. Pa. Apr.16, 2003)).

In the instant case, discovery has already been completed and Plaintiff's claims that survive summary judgment are ready to proceed to trial.  In addition, it is undisputed that Plaintiff did not move for "notice" prior to discovery.  (See Def.'s Mem. in Opp'n to Pl.'s Mot. for Collective and Class Action Certification ("Def.'s Opp'n to Pl.'s Mot. for Certification") 22, ECF No. 35.)  Therefore, the court finds that the stricter standard of the second phase is appropriate.  *See Olivo v. GMAC Mortg. Corp.*, 374 F. Supp. 2d 545 (S.D. Mich. 2004).

At the outset, the court notes that "[s]ection 216 does not define 'similarly situated,'" *Wilks v. Pep Boys*, No. 3:02-0837, 2006 U.S. Dist. LEXIS 69537, at *8 (M.D. Tenn. Sept. 26, 2006), and

-37-

that "even at the decertification stage, similarly situated does not mean identically situated." *Id.* at

*9.  Courts consider several factors at this stage, including: "(1) the disparate factual and

employment settings of the individual plaintiffs, such as:  a) job duties; b) geographic location; c)

supervision; and d) salary; (2) the various defenses available to the defendant that appear to be

individual to each plaintiff; and (3) fairness and procedural considerations." *Id.*  Under the fairness

factor, or sometimes as a separate test, courts balance

> whether certification would serve the purposes of a collective action
> under the FLSA, *e.g.*, whether it would (1) lower the cost of the
> action to individual plaintiffs; and (2) increase judicial utility by
> providing for efficient resolution of many claims in one proceeding
> . . . . against factors such as (1) any prejudice to the defendant; and
> (2) any judicial inefficiencies that may result from allowing plaintiffs
> to proceed collectively.

*Id.* at *10 (quotations and citations omitted).

Plaintiff did not submit evidence with his original Motion from other potential class

members.  However, he attached affidavits from James Brooky ("Brooky") and Cindy Williams

("Williams") with his Reply Brief.[9]  Brooky was a respiratory therapist at the CCF from July, 1986,

until January, 2006, and now lives in Bartow County, Georgia.  (Decl. of James Brooky ("Brooky

Decl.") ¶ 1, ECF No. 47-2.)  Brooky averred that 90 percent of his meal periods were interrupted and

that he was not trained to use the logbook to record interrupted lunches, nor was he ever "trained on

---

[9]        Plaintiff also submitted an affidavit from Jane Doe ("Doe"), (Decl. of Jane Doe ("Doe
Decl."), ECF No. 43-3, at 3-4), which Defendant moved to strike because it is
anonymous.  (Def.'s Sur-Reply in Opp'n to Pl.'s Mot. for Collective and Class
Certification ("Def.'s Surreply Br.") 8-11, ECF No. 49.)  In an Order dated July 13,
2006, the court ordered that "Plaintiff shall reveal the name and address of the Jane Doe
declarant within fourteen (14) days . . . ."  (Order, ECF No. 53.)  As the court finds no
indication in the record that Plaintiff has disclosed Jane Doe's name and address, the
court hereby strikes this declaration.

what constituted a 'no lunch.'" (*Id.* ¶¶ 4, 8.) Williams was a respiratory therapist at the CCF from March, 2001, to March, 2004, and she lives in Lake County, Ohio. (Decl. of Cindy Williams (Williams Decl.") ¶ 1, ECF No. 43-3, at 5.) Williams averred that 95 percent of her meal periods were interrupted and she stated, "I was never trained on when to use the logbook or what constituted a 'no lunch.' It was clear to me that a ten minute lunch was viewed by our supervisors as having taken a lunch." (*Id.* ¶¶ 3, 7, 8.) Both Brooky and Williams testified that they were never told that they were entitled to a 30-minute uninterrupted meal period. (Brooky Decl. ¶ 8; Williams Decl. ¶ 8.) In addition, as discussed in the facts, other therapists have testified as to their differing interpretations of the CCF's policy regarding interrupted lunches, and that they were never trained as to whether an interrupted lunch constitutes a "no lunch."

### 1. Disparate Factual and Employment Settings of Individual Plaintiffs

The court finds that the fact that many of the declarants are respiratory therapists while Plaintiff is a respiratory technician does not, by itself, preclude a finding that the class members are similarly situated, as all members of each position worked in the same department within the same building, had the same supervisor, and their job duties overlapped significantly. In addition, "[o]ne of the factors material to many courts' analysis of the plaintiffs' factual and employment settings is whether they were all impacted by a 'single decision, policy, or plan.'" *Wilks*, No. 3:02-0837, 2006 U.S. Dist. LEXIS 69537, at *11-*12 (citing *Moss v. Crawford & Co.*, 201 F.R.D. 398, 409-10 (W.D. Pa. 2000)). The instant parties do not dispute that therapists and technicians were all subject to the same meal break policies at issue in this case. As discussed above, a genuine issue of material fact exists about whether Defendant's policy allowed therapists and technicians to record their interrupted lunches or only their missed lunches, as well as how Defendant defined a missed lunch.

Therefore, the court finds that Plaintiff has submitted substantial evidence to demonstrate that a central policy exists that binds the potential class members together.

## 2. Various Defenses Against Individual Plaintiffs

The court rejects Defendant's argument that the court would have to conduct an individualized inquiry into the factual circumstances of each putative class member to determine if he or she is similarly situated to Plaintiff. Defendant further argues that there are individual defenses against Plaintiff relating to his failure to record his missed lunches. The court notes that summary judgment has been granted on the issue of Plaintiff's missed lunches, and that the issue of Plaintiff's interrupted lunches depends on the finding as to the scope of Defendant's policy. Furthermore, while each class member may have individualized damages, the court finds that the main inquiry is common to all, namely, what the CCF's policy was regarding interrupted lunches and whether that policy was communicated to the therapists.

## 3. Fairness and Procedural Considerations

The court finds that each individual therapist's damages are small enough that bringing separate suits would be prohibitively expensive to the putative class members. The court also finds that judicial utility will be served by determining the CCF's policy as to interrupted lunches in a collective action rather than in multiple suits. In addition, the court does not find that a collective action will prejudice Defendant because each putative class member will still bear the burden to prove his or her own damages. Finally, the court notes that it has other procedural options, including bifurcation, by which to efficiently handle the issue of damages. As such, the fairness element weighs in Plaintiff's favor.

Therefore, Plaintiff has satisfied the requirements to bring a collective action, and the court hereby certifies the collective action as to Plaintiff's FLSA claims based on his interrupted lunches.

### C. Class Certification Under Rule 23

Plaintiff also seeks class certification of his proposed class under Federal Rule of Civil Procedure 23(a) and 23(b)(3).  As the court has granted summary judgment for Defendant on his FLSA claim and state claims based on missed lunches and breach of contract, his motion to certify is denied as moot as to those claims.  For the reasons that follow, the court hereby certifies Plaintiff's FLSA and state claims based on his interrupted lunches as a class action.

A court must engage in a "rigorous analysis" of the plaintiffs' ability to meet the requirements of Federal Rule of Civil Procedure 23(a), before certifying a class.  *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982 ).  To obtain class certification, Plaintiffs must satisfy the requirements of Rule 23(a) commonly known as numerosity, commonality, typicality, and adequacy of representation, and demonstrate that the class fits under one of the three subdivisions of Rule 23(b).  *Coleman v. GMAC*, 296 F.3d 443, 446 (6th Cir. 2002).  A district court has broad discretion in determining whether to certify a class, within the dictates of Rule 23.

### 1. Definition of the Class

Before analyzing the requirements of Fed. R. Civ. P. 23(a), a court should first "consider whether a precisely defined class exists and whether the named plaintiffs are members of the proposed class." *Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 477 (S.D. Ohio 2004) (citing *East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).  As stated above, Plaintiff's proposed class is defined as follows:

> All non-exempt respiratory therapists employed by The Cleveland
> Clinic Foundation who, since May 1, 2002, have not been afforded

> a bona fide meal period of at least 30 minutes per shift, and who
> have therefore worked without receiving compensation.

(Pl.'s Am. Compl. §§ 18, 19.)  Although Plaintiff is a respiratory technician, not a respiratory

therapist, and thus is arguably not a member of his proposed class, Defendant does not challenge the

definition of the proposed class.  The court notes that Plaintiff uses these terms interchangeably

throughout his briefings due to the overlapping duties and the undisputed fact that the CCF's meal

break policy applied to both positions equally.  While the court declines to decide whether the

positions are in fact interchangeable, it finds that this distinction is insufficient to require the denial

of class certification.  Therefore, for clarification purposes only, the court adds the words "and

respiratory technicians" to Plaintiff's proposed class.  Accordingly, the proposed class is defined

sufficiently precisely and that Plaintiff is a member of the class.

### 2. The Requirements of Rule 23(a)

Under Rule 23(a), a class action may not be maintained unless the following preconditions

are met: (1) the class must be so numerous that joinder of all members is impracticable; (2) there

must be questions of law or fact common to the class; (3) the claims or defenses of the representative

parties must be typical of the claims or defenses of the class; and (4) the representative parties must

fairly and adequately protect the interests of the class.

#### a. Numerosity

There is no specific number at which a class is automatically certified or precluded.  *Senter

v. GMC*, 532 F.2d 511, 523 n. 24 (6th Cir. 1976).  Impracticability of joinder is not determined

according to a strict numerical test but upon the circumstances surrounding the case. *Id.* (citing *Cash

v. Swifton Land Corp.*, 434 F.2d 569, 571(6th Cir. 1970)).  The record shows that Plaintiff provided

a list of 165 persons.  (Pl.'s App'x of Docs. in Supp. of Pl.'s Mem. in Supp. of Pl.'s Mot. for

-42-

Collective and Class Certification ("Pl.'s App'x"), at tab 8, ECF No. 22.) Although it is not clear from the record, Defendant states that 95 persons are current therapists and that the rest are former therapists from the last three years. (Def.'s Opp'n Br. at 30.) Defendant argues that the fact that Plaintiff has provided a complete list of identified proposed plaintiffs, including addresses and telephone numbers, and that the list indicates that the vast majority of these persons reside in Ohio precludes a finding of numerosity. However, the court finds that Plaintiff has satisfied the numerosity requirement due to the large number of proposed class members.

### b. Commonality

Rule 23(a)(2) simply requires a common question of law or fact. As stated above, the court finds that the question of whether the CCF allowed therapists to be reimbursed for their interrupted lunches is a common issue to all putative class members. Therefore, the court finds that Plaintiff satisfies the commonality element.

### c. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." In the instant case, Plaintiff claims, just as each of the Proposed Class Members claim, that Defendant is obligated to reimburse them for their lunches that were interrupted and for which they were not paid.

Furthermore, despite Defendant's contention that there are individual defenses against Plaintiff because he affirmatively failed to record his missed and interrupted lunches,

> unique defenses asserted against class representatives need not ultimately destroy typicality. Typicality will only be destroyed where the defenses against the named representatives are 'likely to usurp a significant portion of the litigant's time and energy,' and there is a danger that the absent class members will suffer if their representative is preoccupied with defenses unique to it.

*Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 483 (S.D. Ohio 2004) (quotation omitted). Finally, the court notes that Defendant's objections to class certification focus on missed lunches, for which summary judgment has already been granted in Defendant's favor, and scarcely mention interrupted lunches. While some class members, including Plaintiff, may have affirmatively chosen not to record their interrupted lunches, the significance of this fact depends on whether the CFF even allowed therapists to record their interrupted lunches at all. Therefore, the court finds that Plaintiff satisfies the typicality requirements of Rule 23(a)(3) in the instant case.

### d. Adequacy of Representation

Rule 23(a)(4) requires that Plaintiff demonstrates that the representative parties will fairly and adequately protect the interests of the class. The Sixth Circuit has developed two criteria that must be met to satisfy the adequacy of representation requirement. First, the representative must have common interests with unnamed members of the class, and second, it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel. *See In re American Medical Sys.*, 75 F.3d 1069, 1083 (6th Cir. 1996) (citations omitted). The *In re American Medical Systems* court noted that Rule 23(a)(4) tests "the experience and ability of counsel for the plaintiffs and whether there is any antagonism between the interests of the plaintiffs and other members of the class they seek to represent." *Id.* (quoting *Cross v. National Trust Life Ins. Co.*, 553 F.2d 1026, 1031 (6th Cir. 1977)).

Defendant argues that the possibility that Plaintiff threw out calendars on which he had recorded his missed lunches creates an individual defense against Plaintiff that makes him inadequate to represent the putative class. However, as discussed previously, spoliation of evidence is not an affirmative defense, and the questions of what CCF-related information Plaintiff recorded

-44-

on his calendars and when and why he disposed of those calendars are issues of fact to be dealt with in the context of all the evidence of the case.

The court finds no indication that Plaintiff will not vigorously prosecute the case or that Plaintiff's counsel is not competent.  Therefore, Plaintiff has shown that it will adequately represent the interests of the putative class.

Accordingly, the court finds that Plaintiff has satisfied all the preconditions of Rule 23(a).

### 3. The Requirements of Rule 23(b)(3)

Rule 23(b)(3) requires that the court find that

> the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

The key issue in the instant case is whether the CCF allowed therapists to record, and be reimbursed for, their interrupted lunches.  As discussed above, that issue is common to all putative class members, and it predominates over the issue of each individual therapist's damages.  In addition, due to the small individual damages potentially due each class member, a class action makes more sense than requiring each therapist to bring a separate claim.  Once again, the court notes that other procedural options, including bifurcation, exist by which to efficiently handle the issue of damages.  In sum, the court finds that a class action is superior in the instant case.

-45-

Accordingly, the court hereby certifies Plaintiff's FLSA and state claims for interrupted lunches as a class action.

### D. Statute of Limitations

As the Sixth Circuit stated in *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 842 (6th Cir. 2002):

> While the FLSA normally has a two-year statute of limitations for actions to recover unpaid overtime, the Act extends the limitations period to three years if the defendant's violation was willful. 29 U.S.C. § 255(a).  The Supreme Court has explained that a FLSA violation is willful if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 100 L. Ed. 2d 115, 108 S. Ct. 1677 (1988).

Plaintiff alleges that Defendant's actions are willful, and hence alleges a putative class beginning May 1, 2002. (Pl.'s Am. Compl. ¶¶ 33, 37.)  Defendant argues that Plaintiff will not be able to show any evidence of willfulness, and therefore that any class that might be certified should commence on May 1, 2003.  (Def.'s Opp'n Br. at 21.)  Because Defendant did not move for summary judgment on the issue of willfulness, the court had no occasion to address this issue.  Therefore, the court will hold a pretrial conference on October 25, 2007, at 3:00 p.m., to discuss with the parties issues related to the start date of the class and collective action certification period, as well as other issues related to the process of collective action and class certification and other outstanding issues.

### IV. CONCLUSION

For the above-stated reasons, Defendant's Motion for Summary Judgment (ECF No. 38) is granted as to Plaintiff's federal and state claims relating to his missed lunches, granted as to Plaintiff's breach of contract claim, and denied as to Plaintiff's federal and state claims relating to his interrupted lunches.  In addition, Defendant's Motion for Collective and Class Action

-46-

Certification (ECF No. 20) is granted in part and denied in part.  Specifically, Plaintiff's FLSA claim regarding his interrupted lunches is hereby certified as a collective action and class action, while his motion to certify his FLSA claims relating to his missed lunches as a collective action is denied as moot.  Plaintiff's state claim relating to his interrupted lunches is certified as a class action, while his motion to certify his state claim regarding his missed lunches and his claim for breach of contract are denied as moot.

In addition, the court will hold a pretrial conference on October 25, 2007, at 3:00 p.m. regarding outstanding issues related to the process of collective action and class certification, including from which date the class should be certified, as well as any other outstanding matters.

IT IS SO ORDERED.

/s/ *SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE

September 30, 2007

-47-